In re FLAGLER–AT–FIRST ASSOCI-
ATES, LTD., a Florida limited
partnership, Debtor/Debtor–in–Possession.

Bankruptcy No. 88–01097–BKC–AJC.

United States Bankruptcy Court,
S.D. Florida.

May 11, 1989.

Richard S. Rachlin, Payton & Rachlin, P.A., and John H. Genovese, Stroock & Stroock & Lavan, Miami, Fla., for Flagler–At–First Associates, Ltd.

Brian Gart, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, Fla., for Foremost Inv., N.V.

Michael Ullman, North Miami Beach, Fla., Ullman & Ullman, for Capital Bank.

Roger G. Medcalf, Miami, Fla., for Sunbeam Television Corp.

## MEMORANDUM OPINION

A. JAY CRISTOL, Bankruptcy Judge.

This cause came before the Court on March 8, 1989, for the continued hearing on the Motion For Section 506 Valuation filed by the Debtor/Debtor–in–Possession, Flagler–At–First Associates, Ltd., a Florida limited partnership ("Flagler"). This Memorandum Opinion is intended to constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 and Bankruptcy Rules 7052 and 9014.

Flagler has since 1984 owned and operated a 14–story building in downtown Miami, located at 14 N.E. 1st Avenue, built in 1952 and now named the Israel Discount Bank Building (the "Building"), after a major

tenant. For many years, the Building was home to the U.S. Bankruptcy Court.

The Court is generally familiar with Flagler's operation of the Building through an adversary proceeding and numerous hearings pertaining to relief from stay and adequate protection issues.

Flagler, in its Motion For 506 Valuation seeks to value the secured claims of Sunbeam Television Corporation ("Sunbeam"), Capital Bank ("Capital") and Foremost Investments, N.V. ("Foremost"). Sunbeam has a first mortgage lien on the Building and Capital, a second. Foremost holds a wrap around mortgage wrapping the first and second mortgages. The total amount of its claim will be determined by the Court in a currently pending adversary proceeding captioned *Flagler At First Associates, Ltd. v. Sunbeam Television Corp.*, Adv. No. 88–0347–BKC–AJC–A; *Foremost Investment, N.V. v. THG, INC.*, ADV. NO.: 88–0273–BKC–AJC. In this controversy, Flagler agrees that both Sunbeam's and Capital's lien positions are fully secured and disputes only that Foremost is fully secured. Indeed, Flagler claims that Foremost is substantially undersecured. Betsy Lee Turner holds a subordinate mortgage which is clearly, after application of Section 506(a), unsecured.

### THE EVIDENCE

Flagler offered three witnesses to support its valuation of the Building. Sergio Ubilla, the manager of the Building, testified that the general trend in the Building has been an increase in gross rental revenues but that the Building has experienced high turnover in the last several years. Ubilla stated that he has attempted, to the extent that he was able, to collect "pass-throughs" from tenants provided for in their leases. The pass-throughs consist of increases in real estate taxes, annual increases based upon the Consumer Price Index ("CPI"), operating expenses and electricity expenses.

It is clear from Ubilla's testimony that he believes that he is collecting what the market will bear from tenants and that if Flagler tried to collect all of the pass-throughs

provided for in the leases, tenants would offer resistance and many would breach their leases and leave the Building. In Ubilla's experience, it is not cost effective to lose tenants and file lawsuits. Prudent management, in his view, requires that the Building retain its tenants.

Robert E. Transue, who has extensive experience in the appraisal of commercial property in South Florida, was called as Flagler's expert. Transue was retained specifically for the purpose of the valuation proceeding and spent in excess of 100 hours in his effort. His appraisal was received in evidence as Debtor's Exhibit 3.

Transue testified that the highest and best use of the Building was its present use, mixed retail and office space. In his view, a purchaser would be willing to pay a price equivalent to the long term net rental income stream from the Building reduced to a present value.

At the outset, Transue stated that because the entire property is not owned by Flagler, the value of its leasehold interest must be determined. His appraisal uses several comparable sales occurring over several years. Based upon those comparable sales and the present lease payments, his opinion as to the value of the leased fee interest is $1,270,000.

Transue used the income approach to value the Building as a starting point. He used *the existing rent rolls* and supporting documents to determine the annual present gross rental revenues of $1,564,564.

In order to project long term revenues, and to project use of currently vacant rentable space, Transue assumed that the Building would achieve 95% occupancy within one year; the cost of achieving stabilized occupancy, reduced to present value is $380,000. *See* Exhibit 3 at page 121.

Transue concluded that the annual effective gross revenue at stabilized occupancy would be $1,841,267 less annual expenses of $946,000 yielding a net operating income of $895,267. Using a 9% capitalization rate, a present value of $9,947,411 is achieved. When the value of the land lease $1,270,000 is deducted, the Building, as a

leasehold, has a value of $8,677,411. When present value of the discounts of $380,000 [1] is subtracted, the value of the Building on a going concern basis "as is" is $8.3 million. *See,* Debtor's Exhibit 3 at page 122.

In an apparent attempt to bolster Transue's appraisal, Flagler offered an appraisal prepared by J. Mark Quinlivan, another experienced appraiser. Quinlivan was retained in connection with Foremost's Motion For Relief From Stay filed early in the proceeding. Over Foremost's objection, more particularly discussed below, the Court admitted the Quinlivan appraisal as Debtor's Exhibit 2.

The Quinlivan appraisal, which was completed April 15, 1988, uses many of the same comparable sales relied on by Transue. Using an income approach to value, Quinlivan stabilized occupancy of 93% within one year.[2]

Additional assumptions made by Quinlivan in his appraisal are that lease passthroughs, presently at approximately $70,000 per year, would increase and that the pass-throughs for CPI, in particular, would increase at the rate of 4.5% per year.

After using the discounted cash flow analysis, Quinlivan reached a present value of $9.7 million for the Building and a $1,327,061 value for the leased fee interest. Debtor's Exhibit 2 at page 71. After subtracting the value of the lease fee, Quinlivan determined that the value of the Building as of April, 1988, was $8.4 million. Although there were some differences in methodology, Quinlivan's value conclusion was virtually identical to Transue's.

Transue, as well as Thomas Dixon Foremost's expert, stated that in determining what the net amount received by a seller of the Building, disposition costs, such as documentary stamps, closing costs and especially real estate commissions, should be deducted. More particularly, Transue testified that if the Building were sold in the next 90 days, the estate would receive 3–5% less than his stated value.

Transue further testified that the tax assessment on the Building was supportive of, or at least not inconsistent with, his and Quinlivan's opinion as to value.

Foremost, faced with two formal appraisals, now vigorously opposes their stated values. First it relies on the value of the Building as set forth in its Schedules filed with the Court and the purchase price paid by Flagler in 1984. It relies also on an analysis of its accountant, as to what *would* be collected on pass-throughs if all typical lease provisions allowing for the collection of pass-throughs for real estate taxes, operating expenses, electricity and CPI are enforced and those amounts are collected from tenants. *See* Foremost's Exhibit 2, a summary prepared by Alberto G. Manrara. However, Foremost suggests that all of the foregoing expenses can be passed through; both Ubilla and Transue testified that only *increases* after the base year are typically passed through.

Dixon, another experienced appraiser, prepared an eleven-year cash flow projection using Manrara's summary as a starting point. *See* Foremost's Exhibit 3. His assumptions are that Flagler should *now* be collecting approximately $1.7 in gross rental revenue contrasted with approximately $1.5 million of actual present gross rental revenues. He assumes that there will be stabilized occupancy and an annual increase in CPI pass-throughs of 4% per year for the eleven years *on all of the leases.* Using a discounted cash flow analysis and a discount rate of approximately 11.5%, Dixon valued the Building at approximately $10 million.

Foremost also offered testimony of Quinlivan in its case. Essentially, his testimony was that his prior appraisal, although accurate when done, should be adjusted upwards because he did not review the leases themselves. His failure to review the leases, in Foremost's view, undermines the accuracy of his appraisal and an objection to admissability was made on that basis. His upward adjustment is based almost entirely

---

1. Those discounts are "loss for rent-up, tenant improvements finish, leasing commissions and rent loss-existing rents."

2. In fact, Quinlivan's forecast has not been met.

upon his review of the Manrara summary. He indicated that a value of $9.7 million would be appropriate assuming that *all pass-throughs*, not just increases, could be collected.

In rebuttal, Transue testified that there were serious flaws in the methodology and conclusions used by Foremost's witnesses. One principal deficiency, according to Transue, was that Dixon assumed that there would be 4% annual CPI increases on the 28% of the leases (based upon total income of the Building) which do not even contain CPI pass-through provisions. According to Transue, with all other assumptions being true and given the fact that Dixon forecasts increasing expenses, this error alone would cause an a downward adjustment in Dixon's value to $8.4 million using his own land value.

Transue additionally testified that Dixon did not use the correct discount rate in arriving at his present value. According to Transue, there is a generally accepted formula to determine the discount rate when a discounted cash flow analysis does not use a constant dollar, and instead forecasts increases in CPI. The formula takes into account the decline in the buying power of the invested dollar. Application of that formula to Dixon's projections would require the use of a discount rate of 13.88%, which is higher than that used by Dixon. All other assumptions being true, this would cause a downward adjustment in Dixon's projections to approximately $8.5 million.[3]

## RESOLUTION OF THE VALUATION TESTIMONY

There seems to be no dispute that this Building is presently generating gross rental revenues of approximately $1.5 million per year. Transue used that number as the base in his projections. Quinlivan's appraisal used the *actual* rental revenues in April, 1988.

Foremost's entire case seems to rest on its assumption that Flagler *should be* collecting every cent of pass-throughs under the leases. Thus, according to Dixon, at the present time Flagler should be collecting in excess of $200,000 more than it is.

However, the testimony of Sergio Ubilla on the issue was emphatic and, more importantly, uncontroverted. He is presently collecting on behalf of Flagler all that he can collect under the pass-through provisions of the leases. To press for more, in his view, would cause tenants to vacate the Building for cheaper space. In each instance where he was questioned about the inability of Flagler to collect pass-throughs on specific leases, he had a plausible explanation as to why Flagler could not negotiate for a greater amount.

Transue, in making his projections, used the current actual pass-through revenues of approximately $70,000 which would be stabilized because of turnover in the Building, and he further testified that the amount collected by Flagler as pass-throughs is fairly typical of the market as demonstrated by several comparable properties. Quinlivan, in his appraisal, also used the same numbers. Historically, the Building has not collected significant pass-throughs and when Foremost owned the Building, it collected only approximately $20,000 annually, far less than Ubilla collects.

Acceptance of Foremost's position would require the conclusion that the Building is not now prudently managed nor was it prudently managed when it was the owner or when its receiver operated the Building. However, Transue testified that the Building is competently managed and no evidence at all was offered suggesting mismanagement in any other area. Moreover, the receiver appointed in Foremost's foreclosure made positive comments about present management,[4] and the Third Dis-

---

**3.** Dixon failed to take into an account the requirement of installing a $300,000 sprinkler system as a reduction, based upon conversations with an unnamed City official. However, Flagler has received a notice of deficiency, Debtor's Exhibit 1, and it appears clear that a sprinkler system will be required.

**4.** Herbert Shapiro testified in the adversary proceeding that Ubilla was a capable and competent manager.

**376**

trict Court of Appeal of Florida reversed the Circuit Court's appointment of the receiver for the failure of Foremost to demonstrate waste.[5] In short, if Foremost's assertion were correct, it surely would have been alleged and proved before now; the documents which support its theory have long been available.[6]

Dixon's projections are similarly flawed. His projections assume collection of *all pass-throughs* and a yearly increase in CPI of 4%. Yet, Dixon concedes that the market for office space in Miami has been soft and is only within the last year that CPI has increased 4%. It seems fanciful, in light of his own testimony, to assume annual increases of 4%, particularly since asking rates have declined within the last year.

The scheduled value of the Building is evidence of value, but the Court cannot give it much weight. It is not uncommon for debtors to overvalue their assets and, based upon the purchase price paid by Flagler, it is not surprising that it valued the project higher than its true worth. However, Flagler here is acting on behalf of the estate and its creditors, and the Court is required to determine the actual value of the Building.

The Court has received two formal appraisals in the $8.3 million range, one of which was completed on Foremost's behalf and the appraisal recently prepared by Transue. Section 506 of the Bankruptcy Code states that a claim is a secured claim "to the extent of the value of such creditor's interest in the estate's interest in such property." It is undisputed that, after subtracting costs of disposition of the property, the amount to be received by the estate in a sale, or the "estate's interest in the property," would be significantly less. Thus, valuing the Building at $9 million is certainly reasonable, and the Court finds

that the total secured claims against the Building do not exceed $9 million.

## THE LEGAL ISSUES

As has been mentioned, Section 506 of the Code provides that an "allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that such creditor's interest ... is less than the amount of such allowed claim." 11 U.S.C. § 506(a).

An issue has been raised by Foremost pertaining to the date upon which the collateral is to be valued. Section 502, which determines which claims are allowed after objection, provides that the Court "shall determine the amount of such claim ... as of the date of the filing of the petition." 11 U.S.C. § 502(b). Section 506 then, must be read in conjunction with Section 502(b). Thus, when Section 506 refers to "allowed claims" being "secured claims" it is intended to be consistent with Section 502(b). Stated more simply, an allowed secured claim is determined "as of the filing of the petition," just like any other claim.

Section 506(b) permits *oversecured* creditors to receive post petition interest on their allowed secured claims, but no provision is made for the allowance of interest to undersecured creditors.

Nothing contained in Section 506 suggest a contrary result, and there is nothing which alters 502(b). Some confusion is caused by the last sentence of Section 506(a), which provides that "such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of the property, and in conjunction with any hearing on such disposi-

5. *Sazant v. Foremost Investments, N.V.,* 507 So.2d. 653 (Fla. 3rd DCA 1987).

6. Ubilla testified that all of the documents provided to Manrara and Transue in connection with the hearing were made available to Quinlivan one year ago. Quinlivan testified that he did not review the leases themselves because it was too "cumbersome." However, in his ap-

praisal he specifically discusses the collection of pass-throughs, and in discussing at least one comparable property, he describes the collection of CPI as "negotiable." *See* Debtor's Exhibit 2, at page 30. Moreover, he sets forth no specific reservation in his standard conditions pertaining to the leases.

tion or use ..." However, even though the value determined in a Section 506 hearing takes into account a proposed disposition of the property, the allowed secured claim is still fixed as of the filing date. Thus, the court can make a finding in connection with a liquidating plan that the value of a secured claim is significantly less than a going concern valuation made earlier for the purposes of adequate protection. "To illustrate, a valuation early in the case in a proceeding under sections 361–363 would not be binding upon the *debtor or the creditor* at the time of confirmation of the plan." *Notes of the Committee on the Judiciary Senate Report* No. 95–989, (emphasis added). However, the valuation in the liquidating plan would still use the liquidation value *as of the filing date.*

The Supreme Court in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), makes it clear that nothing in Section 506 changes the fundamental proposition that claims are fixed as of the filing date and that undersecured creditors do not receive preconfirmation interest on their secured claims. The Court stated: "If (compensation for delay in enforcing security interests), were included, the 'value of such creditor's interest' would increase, *and the proportions of the claim that are secured and unsecured would alter,* as the stay continues ... *No one suggests this was intended.*" Id. 108 S.Ct. at 630 (emphasis added).

The same result is reached by Judge Proctor in *In re Canaveral Seafoods, Inc.,* 79 B.R. 57 (Bankr.M.D.Fla.1987): "In valuing the security, it is important to recognize that it is (the creditor's) interest that is valued under Section 506(a) of the Bankruptcy Code ... Secondly, the valuation of the collateral is determined as of ... the date the Chapter 11 petition was filed."

In this case although the issue of the date of the valuation was raised by Foremost, after consideration of its evidence it seems that the difference in dates is insignificant. Foremost does not argue that the value of the Building has increased signifi-

cantly since the filing date. Indeed, in its Motion for Relief From Stay it alleged that "the value of the Building shall remain stagnant or decrease" and that the "amount of indebtedness secured by the Building is so grossly disproportionate to its value as to establish beyond question that there is no meaningful hope for an effective reorganization." Motion For Relief From Stay at pages 12 and 14. What it argues is that Quinlivan's appraisal of a year ago would have been significantly increased if he had in fact reviewed the leases.

■ Transue testified convincingly that there is little difference in value between now and April, 1988 and no measurable difference between the filing date and that date.

The Court has determined that the value of the Building is $9 million. Foremost has suggested that its wrap mortgage is the only secured claim and the Court should not separately value the secured claims of Sunbeam and Capital because neither has recourse against Flagler and Flagler does not have a contractual relationship with those entities. This position, however, is entirely inconsistent with the Code. A "claim" is defined as a "right to payment whether or not such right is ... legal, equitable, secured, or unsecured; or right to an equitable remedy for breach of performance if such breach gives a right to payment ..." 11 U.S.C. § 502(a) and (b). Section 102 of the Code, which sets forth rules of statutory construction, states that such claims "include claims against property of the debtor." 11 U.S.C. § 102(2). It cannot be seriously suggested that Sunbeam and Capital do not have a right to payment, nor that they do not have claims against the property. Thus, both Sunbeam and Capital have fully secured claims, and Foremost has a partially secured, or undersecured, claim.

The Court has found that the value of the Building is $9 million. It has not been provided with a specific amount of the Sunbeam indebtedness, because Sunbeam, the holder of the first mortgage, has never appeared in these proceedings despite am-

ple notice. Sunbeam is directed to provide the Court an estoppel letter, with copies to counsel, setting forth the amount owed under its mortgage within fifteen days from the date of this Memorandum Opinion so that Flagler can determine whether it will stipulate to such amount. If Sunbeam fails to do so, the Court will determine that Sunbeam has a secured claim in an amount suggested by the parties.

Capital announced at the hearing that it asserts a secured claim comprising, as of March 1, 1989, principal due of $2,725,000, accrued interest of $24,898.29 with a per diem rate of $858.56, late charges of $8,516.63 and attorneys' fees of $4,587.50. The parties did not object to Capital's claim as stated. The amount of default interest, if any, or Capital's right thereto shall be determined at a later time upon appropriate motion or stipulation. The amounts described above may fluctuate because Flagler is making monthly mortgage payments.

Foremost's secured claim, for the purposes of a plan of reorganization, shall be the difference between the total of the Sunbeam and Capital secured claims and $9 million and it is subordinate to both of those secured claims. The Court, of course, retains jurisdiction to enter appropriate orders fixing the precise amount of the Sunbeam, Capital and Foremost claims.

Valuing the secured claims and Foremost's secured claim in particular has not been a mechanical process. The Court has been advised that Flagler is paying debt service slightly in excess of the Building's value. Thus, it is likely that Flagler will be able to formulate a plan which will, at minimum, satisfy the secured creditors. In these circumstances, if the Court found that the secured claims exceeded the actual value of the Building it might well scuttle Flagler's ability to promulgate a plan providing for same payment to unsecured creditors. It would be inequitable to do so.

DONE and ORDERED.